IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 3, 2021 Session

## GREGORY CHARLES HOPPE v. SUSAN LYNN HOPPE

**Appeal from the Circuit Court for Davidson County**
**No. 14D-1303          Joseph P. Binkley, Jr., Judge**
_____

### No. M2020-00331-COA-R3-CV
_____

In this post-divorce visitation dispute, the father appeals the denial of his petition to modify the permanent parenting plan and require the mother's visitation to be supervised "indefinitely." Before the divorce, the mother's visitation was suspended after she falsely accused the father of sexually abusing the parties' minor son. The mother's visitation was restored when she presented evidence that she was in mental health therapy for her "obsessive" fears. Two months later, in early 2016, the parties agreed to a permanent parenting plan that required the mother to, *inter alia*, continue her therapy. The parties also agreed for their son to attend counseling to help him remain psychologically healthy despite the parties' contentious relationship. The mother did not, however, continue her treatment as agreed, and she soon resumed making allegations against the father. Thus, just three months after the parenting plan was entered, her visitation was suspended again. The mother's visitation remained restricted for a year, during which she struggled to comply with various court orders. In April 2017, the parties agreed for the mother's visitation to be restored after she presented evidence she was progressing again in her mental health treatment. The parties also agreed for the son to continue counseling for another 18 months. Then, in November 2018, the mother made additional false allegations against the father. The father then filed a petition to modify the parenting plan and restrict the mother's visitation "indefinitely." Finding the mother's behavior endangered the children, the trial court significantly restricted the mother's parenting time and allowed only limited supervised visitation pending a final hearing. Due to several procedural delays, the final hearing was not held until January 2020, by which time the mother's visitation had been severely restricted for a year. After the hearing, the court denied the father's petition and restored the mother's visitation. The court was persuaded, in part, by evidence that the mother was progressing again in her therapy. The court credited the opinion of the mother's clinical psychologist, who stated the mother had "gotten better," understood "that she cannot say things that would alienate [the father from] the children," was "a loving and devoted parent," and would "now follow the rules." The court also agreed with the psychologist's opinion that the son needed more counseling because he needed "to be able to talk to somebody [he could] trust." Based on these and other findings of fact, the trial

court found no material change in circumstance existed; however, it ordered that the mother and the parties' son continue therapy. The court also denied the mother's request for an award of attorney fees as the "prevailing party" under the marital dissolution agreement and Tenn. Code Ann. § 36-5-103(c). Both parties appealed. Having determined the evidence does not preponderate against the trial court's finding that no material change of circumstance existed as of the time of trial, we affirm the denial of the father's petition to modify the parenting plan. We vacate, however, the court's order requiring the son to continue therapy because the issue was not before the court. We also affirm the denial of the mother's request to recover her attorney's fees.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed in Part and Vacated in Part**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which THOMAS R. FRIERSON II and W. NEAL MCBRAYER, JJ., joined.

Peggy Smith Pulley, Ashland City, Tennessee, for the appellant, Gregory Charles Hoppe.

Deana Hood, Franklin, Tennessee, for the appellee, Susan Lynn Hoppe.

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

Gregory Charles Hoppe ("Father") and Susan Lynn Hoppe ("Mother") were married in November 2005. It was the third marriage for Father and the first for Mother. The couple had a son ("OH") in November 2009 and a daughter ("LH") in December 2012 (collectively, "the Children").[1]

At the time of the marriage, Mother knew that Father was involved in an ongoing visitation dispute with his first wife that involved allegations of child sexual abuse. Father denied the allegations, which were never substantiated. The dispute between Father and his ex-wife was resolved in 2008.

I. DIVORCE PROCEEDINGS

In May 2014, Father filed a complaint for divorce against Mother, alleging, *inter alia*, that Mother was "falsely accusing [him] of misconduct and/or abuse." The trial court then entered a standard Notice of Statutory Injunction under Tenn. Code Ann. § 36-4-

---

[1] Due to the sensitive nature of the allegations, the parties have referred to the Children by their initials.

106(d)(3), restraining the parties "from making disparaging remarks about the other to or in the presence of any children of the parties."

In her Answer and Counter-Complaint for Divorce, Mother requested an ex parte restraining order on behalf of the Children because of concerns that Father was sexually abusing OH. Mother explained that she took OH to see a licensed social worker in December 2013 after observing "suspicious" and "inappropriate" behavior from OH. In an attached affidavit, the social worker, Juanita Oakes, stated that she believed OH was the victim of sexual abuse by Father. Ms. Oakes explained that OH described inappropriate "games" that resembled those described by Father's ex-wife in the prior visitation dispute. As a result, the trial court granted the restraining order and placed the Children in Mother's sole custody pending a hearing.

In response, Father submitted the affidavit of OH's occupational therapist, Gloria Isaaks. Ms. Isaaks had been treating OH since 2013, and she was trained to detect signs of child abuse. Ms. Isaaks reported that Mother approached her in March 2014 with a concern that OH's behavior was a sign of sexual abuse. Mother later told Ms. Isaaks that law enforcement had conducted a forensic interview of OH and declined to pursue charges against Father. Ms. Isaaks assured Mother that OH had not exhibited concerning behavior during therapy.

After a hearing, the trial court modified the temporary restraining order to give Father supervised visitation. The court also appointed a forensic psychiatrist, Dr. Bradley Freeman, to conduct a "psychological-sexual evaluation" of Mother, Father, and OH. While Dr. Freeman's report was pending, Father filed a Petition for Criminal Contempt, alleging that Mother violated the injunction in Tenn. Code Ann. § 36-4-106 by making disparaging remarks about him in front of the Children. In an attached affidavit, Father's visitation supervisor stated that Mother told the supervisor that Father was a "known child molester" and that OH "was sexually abused in [Father's] house."

In his report, Dr. Freeman found no evidence to support Mother's claim of abuse. Thus, Dr. Freeman recommended no further investigation into the allegations. He did, however, suggest the parties send OH to therapy. Dr. Freeman also found reason to believe that Mother needed mental health treatment, expressing a concern that her conduct alienated the Children from Father. Thus, the trial court dissolved the restraining order against Father and gave each party equal, unsupervised visitation. The court also ordered the parties to follow Dr. Freeman's recommendations. The court did not adjudicate Father's motion for criminal contempt, but it reminded the parties of the injunction against making derogatory comments about the other parent.

A. Father's First Petition for Temporary Restraining Order

In March 2015, Mother began therapy with a psychiatrist, Dr. Thomas Monroe, and OH started seeing a new social worker, Phyllis Nobles. As part of OH's therapy, Mother

- 3 -

also met with Ms. Nobles. Shortly after the meeting, a second sex abuse referral was made to the Department of Children's Services ("DCS"), and OH underwent another forensic interview. DCS again found the allegations unfounded.[2]

Father then filed a motion to restrict Mother's visitation, asserting she was continuing to alienate the Children from him. At the hearing on Father's motion, Mother asserted that she was "just answering [Ms. Noble's] questions." The trial court warned that repeated, unfounded allegations of abuse could result in a finding that Mother was alienating the Children, but it declined to restrict her visitation. The court also ordered OH to see a different therapist. It clarified that the goal of OH's therapy was to help him "navigate the separation of his parents and to assist him in remaining psychologically healthy in spite of this contentious relationship," but not to "further investigate any allegations of abuse."

### B. Father's Second Petition for Temporary Restraining Order

Two months later, Mother took LH to a pediatrician after observing LH "constantly grabbing her private area." The pediatrician's exam, however, revealed nothing abnormal. A few days later, LH allegedly complained to Mother that her bottom hurt. When Mother asked if someone had hurt her, LH allegedly replied that "daddy did." Mother then took the Children to an urgent care clinic, where LH was examined again. Mother told the physician that Father's ex-wife accused him of sexual abuse and that OH reported inappropriate touching by Father. Still, the second exam revealed nothing abnormal. Nonetheless, the matter was referred to DCS because of the severity of the allegations. After interviewing the Children, DCS again concluded that the allegations were unfounded.

Thus, in July 2015, Father filed another Motion to Modify or Suspend Mother's Visitation/Parenting Time and for Entry of Immediate Restraining Order, asserting that Mother was continuing in her attempts to alienate the Children's affections and subjecting them to unnecessary evaluations. The trial court entered a restraining order, finding "that immediate and irreparable harm to the minor children w[ould] likely result unless [Mother]'s visitation with the minor children [was] temporarily suspended."

In response, Mother asserted that "she was simply answering questions posed by the child's medical provider" and had not understood the court's prior orders about the disclosure of abuse allegations. Mother later moved to have her visitation reinstated, explaining that she acted out of a "genuine fear that her children were being harmed" and asserting that her actions were driven by "counselors telling her they were certain her

---

[2] Although DCS doesn't disclose the source of referrals, Mother agreed that it most likely came from Ms. Nobles after her conversation with Mother. The record doesn't reveal when DCS concluded its second investigation, but it is undisputed that DCS determined that the allegations were unfounded.

children were being molested" and by Father's ex-wife "confirming all [Mother's] worst fears."

Mother also provided a letter from her psychiatrist, Dr. Monroe, who explained that Mother was dealing with "obsessive fears that her son was sexually abused by [Father]" and had suffered "a moderate relapse of intrusive thoughts." Still, Dr. Monroe stated that Mother was improving and would "be able to manage these thoughts in the future and . . . be very supportive of her children's relationship with their father." As a result, the trial court modified the restraining order to give Mother limited, supervised parenting time and set the matter for a review hearing.

Before the review hearing, the parties conducted an evidentiary deposition with Dr. Monroe, a transcript of which Mother filed with the court. According to Dr. Monroe, Mother knew that "she needed to get over [her fears of abuse]" and was motivated to improve. Thus, after the review hearing, the trial court ordered that the supervision requirement would be lifted in December 2015 if there were no further "incidents."

C. Permanent Parenting Plan

Mother successfully resumed her visitation in December 2015. One month later, the parties executed a marital dissolution agreement ("the MDA") and a Permanent Parenting Plan. The Parenting Plan designated Father as the Children's primary residential parent but gave the parties joint decision-making authority. Mother was to pay Father $431 per month in child support and a pro-rata share of extracurricular fees and noncovered medical expenses.

Significantly, the Parenting Plan also required Mother to continue the same course of treatment she represented as helping her in 2015. First, Mother had to provide Father with an update from Dr. Monroe on her progress. Mother then had to arrange for the development of a treatment plan between Dr. Monroe and a new psychiatrist. Mother had to provide the new psychiatrist with documents related to her past treatment, including Dr. Freeman's reports and Dr. Monroe's evidentiary deposition transcript. Finally, upon request, Mother had to provide monthly reports showing that she was complying with the treatment plan "during the duration of the children's minority, or until Mother is released from the[] treatment plan."

The Parenting Plan also required OH to see a licensed social worker, Paris Brown, "with such frequency and duration of therapy as determined in collaboration with Ms. Brown." The Plan reiterated that the goal of OH's therapy was "to assist him with the separation of his parents and remain psychologically healthy in spite of his parent's history of a contentious relationship with each other." It specifically stated that "[t]his therapy shall not include investigation of prior abuse allegations as those allegations have already been investigated." The Plan also reiterated the injunction against making derogatory comments about the other parent or otherwise alienating the Children from the other parent.

The trial court approved and adopted the MDA and the Permanent Parenting Plan in its Final Order of February 3, 2016.

## II. FIRST PETITION TO MODIFY PARENTING PLAN

Consistent with the Permanent Parenting Plan, Mother began to see a new psychiatrist, Dr. David Chang. Even so, Mother did not coordinate her treatment between Dr. Chang and Dr. Monroe, and she did not provide Dr. Chang with the documents specified in the Parenting Plan.

In May 2016—just three months after the divorce was final—Father filed his first Petition to Modify Parenting Plan, to Suspend Mother's Visitation, and for a Restraining Order. In an attached affidavit, Father described being present when Mother told the Children's pediatrician, Dr. Patricia Williams, that she believed the Children had been abused. Mother explained that OH had pain in his penis and bottom, and LH—who was three years old—had been touching herself. OH denied being in pain, and the pediatrician assured Mother that LH's behavior was normal for her age. Nonetheless, Mother insisted that she needed "an advocate" for the Children because she had been under a "gag order" regarding the abuse allegations.

Father also alleged that OH's therapist, Ms. Brown, terminated her services after Mother berated Ms. Brown for not finding any evidence of sexual abuse during therapy. He also asserted that Mother confronted Father's sister at a soccer game, saying she couldn't "believe what [the sister] and [her] family ha[d] done to the children." Moreover, Father stated that he requested but did not receive a compliance report from Mother regarding her mental health treatment. Thus, Father asked the court to suspend or restrict Mother's visitation and to restrain Mother from making further allegations against him.

In response, Mother denied "making any allegations against Father." Still, the trial court found Father's allegations were significant enough to warrant temporarily suspending Mother's visitation pending the depositions of Ms. Brown and Dr. Williams.

Just one week later, law enforcement was called to OH's school when Mother tried to leave with him. Thus, the trial court barred Mother from having any physical contact with the Children. After a hearing, the court modified the restraining order to allow Mother supervised visitation, and it appointed a clinical psychologist, Dr. David McMillan, to conduct a new mental health evaluation.

Less than a month later, however, Father filed a Motion to Suspend Mother's Supervised Visitation and for a Restraining Order, alleging that she made a third abuse referral to DCS. In an attached affidavit, Father stated that DCS contacted him to schedule forensic interviews with the Children. Father also alleged that Mother appeared unannounced at his house and prevented him and the Children from leaving. Thus, the trial

court suspended Mother's visitation again and barred her from contacting Father or the Children.

In a pro se response, Mother explained that she was simply "passing by" Father's house and stopped to say hello. Mother denied that she "continuously reported false allegations" and insisted that "[m]any [of the reports] were [made] by others." She alleged that Father was a known "sexual predator" and contended that "every red flag that [she] ever reported" was reported "in good faith." In contrast to Father, Mother insisted that she was an exemplary parent. She attested to having been "evaluated [by] or received treatment" from ten mental health professionals, of whom "most either wrote a letter on [her] behalf or a deposition was taken revealing no concern with [her] parenting."

After a hearing in September 2016—at which Mother also appeared pro se—the trial court expressed "serious concerns" about Mother's mental health. Accordingly, the court kept the restraining order in place.

The next month, Father filed a second Petition for Criminal Contempt, alleging that Mother violated the restraining order by, *inter alia*, having contact with the Children at extracurricular events. After a hearing at which Father and Dr. McMillan testified,[3] the court found Mother knowingly violating the restraining order. Nonetheless, the court stayed sentencing based on Dr. McMillan's testimony that Mother was making progress in her treatment.

Unlike Dr. Monroe, who tried to help Mother change how she dealt with "intrusive thoughts," Dr. McMillan would later testify that his therapy was concentrated on assisting Mother to control her behavior despite her unwavering belief that Father was abusing the Children.[4] Dr. McMillan succeeded in getting Mother to back down by suggesting they "establish a safety net" for the Children with a new therapist experienced in child sexual abuse issues, Dr. Janie Berryman.

Thus, in January 2017, Mother filed an update from Dr. McMillan, who stated that Mother was ready to "resume her role as parent to the children and behave respectfully toward the father." Then, in April 2017, the parties reached an agreement that "phased in" Mother's parenting time over two months. If her visits occurred without issue, the parties would resume the residential parenting schedule per the Permanent Parenting Plan. Additionally, the Children would attend therapy for 18 months with Dr. Berryman, and Mother had to provide Father with quarterly updates on her mental health treatment.

---

[3] Mother attended the hearing with counsel but did not testify in her defense.

[4] At a hearing in April 2019, Mother called Dr. McMillan to testify and voluntarily elicited testimony about the details of her therapy.

## III. SECOND PETITION TO MODIFY PARENTING PLAN

As agreed, the Children began therapy with Dr. Berryman in or around April 2017, and Mother resumed visitation a few months later. Although Dr. McMillan's court appointment ended, Mother continued seeing him voluntarily and continued reporting what she believed were signs of abuse to Dr. McMillan. Considering the case history, Dr. McMillan told Mother that no one would believe future allegations unless she made an audio recording of the Children disclosing the abuse. It was a comment that Dr. McMillan later testified he regretted making.

The 18-months of therapy ended with no disclosure of abuse from the Children to Dr. Berryman. Then, one evening in November 2018, Mother set an audio recorder in front of OH and asked him to describe how Father had abused him and his sister. With some help from Mother, OH complied. Mother sent the recording to Dr. McMillan and Dr. Berryman, who told Mother to take immediate action to protect the Children. Dr. Berryman also reported the matter to DCS. Mother then took a transcript of the recording to the Davidson County General Sessions Court and obtained an ex parte Order of Protection against Father.

After finding out about the Order of Protection, Father filed a second Petition to Modify Parenting Plan, to Suspend Mother's Visitation and for a Restraining Order. Father asked the court to remove the Children from the Order of Protection, temporarily suspend Mother's visitation, temporarily restrain Mother from making further allegations, and modify the Parenting Plan to "indefinitely" suspend Mother's visitation. The trial court immediately dissolved the Order of Protection, entered a temporary restraining order against Mother, and set the matter for a hearing.

Mother then filed an Emergency Counter-Petition for Modification of Parenting Plan and Request for a Temporary Restraining Order. Mother asserted that the audio recording of OH substantiated her long-standing suspicion that Father "was behaving inappropriately with the children in the nature of sexual abuse." Mother also included the affidavit of Dr. Berryman, who stated that OH's disclosure was "consistent with certain statements" the Children made during therapy. Thus, the trial court dissolved the restraining order against Mother and reinstated the Order of Protection against Father pending completion of the DCS investigation.

Less than two weeks later, the DCS investigator, Darlene Sistrunk, testified that she had completed her investigation and found no cause for concern. Ms. Sistrunk explained that DCS had conducted a forensic interview of OH, visited each parent's home, and met with the Children several times. She recommended that both Mother and Father stop discussing sexual abuse with the Children. Accordingly, the Order of Protection was dissolved. Mother later nonsuited her Petition to Modify the Parenting Plan.

Father then filed another Motion to Suspend Mother's Visitation, contending that the audio recording and the DCS report were evidence that Mother was having inappropriate conversations with the Children. Father also requested a new evaluation of Mother's mental health based on the fact that Mother failed to provide him with quarterly updates as required by the Agreed Order of April 2017. Father later filed a Petition for Civil Contempt, alleging that Mother owed child support and her share of extracurricular and therapy expenses.

After a hearing in January 2019, the trial court limited Mother's visitation to three supervised hours every Thursday and every other Friday, Saturday, and Sunday. The court reasoned that supervision of Mother's parenting time was "the only way [to] stop the minor children from being interviewed by the Defendant/Mother." Mother then filed a Motion to Alter or Amend, contending there was no evidence that unsupervised visitation presented "a substantial likelihood of harm" to the Children as required by Tenn. Code Ann. § 36-6-405(b).[5] The court denied Mother's motion, clarifying that "Mother is not a trained sex abuse investigator and any actions on her behalf to elicit disclosures from the children or memorialize any statement of the children taints that evidence and potentially taints and/or undermines future forensic interviews by trained sex abuse investigators." Thus, the court found "that such behavior . . . is harmful to the children." In the same order, the trial court granted Father's request for a new mental health assessment. It later appointed Dr. William Kenner to conduct the evaluation.

## VI. FINAL HEARING

The final hearing on Father's Petition to Modify Parenting Plan and Petition for Civil Contempt was held on January 6 and 7, 2020. By the time of trial, Mother's visitation had been significantly restricted for almost a year, during which time Mother continued to see Dr. Chang and Dr. McMillan.

Father testified that he was asking the court to impose an indefinite supervision requirement on Mother's parenting time and to restrain her from discussing the sex abuse allegations with anyone. Father also testified that he opposed further therapy for the Children, explaining that they were doing well in school and extracurricular activities.

As for the allegations of sexual abuse, Ms. Sistrunk testified there had been a total of five cases opened by DCS since 2014 involving Father and the Children. As a result, the Children underwent at least three forensic interviews. According to Ms. Sistrunk, all the

---

[5] Tennessee Code Annotated § 36-6-405(b) provides, in relevant part:

In a proceeding for a modification of a permanent parenting plan, the existing residential schedule shall not be modified prior to a final hearing unless the parents agree to the modification or the court finds that the child will be subject to a likelihood of substantial harm absent the temporary modification.

investigations ended with a determination that the allegations were unfounded. Ms. Sistrunk also stated that her discussions with the Children revealed no safety concerns about either parent. Likewise, DCS's forensic investigator, Barbara Tallent, testified that she found no cause for concern after interviewing OH.

Each party also presented lay testimony about their interactions with the Children. Father's nanny, Cheri Sanders, testified that she worked with the Children for three and a half years and never worried about Father's behavior or contact with the Children. Mother's visitation supervisor, Kathy Moss, testified that she supervised Mother's visitation throughout 2019 and did not see Mother question the Children about sexual abuse or have inappropriate conversations with them.

Father also presented the testimony of an independent forensic psychologist, Dr. George Davis, and Mother's court-appointed psychiatrist, Dr. Kenner. Dr. Davis stated that he interviewed OH shortly after the allegations were made in November 2018. At first, OH confirmed the statements from Mother's recording, but Dr. Davis noted that OH quickly digressed and then admitted that the abuse never happened. In addition, Dr. Davis testified that OH was "very . . . confused about what the truth is" and "has difficulty with telling the truth" because he is "telling both parents what they want to hear." Dr. Davis believed that continual discussion of sexual abuse was harmful to OH.

More specifically, Dr. Kenner testified that frequent discussion of sexual abuse with the Children was harmful because it "sexualize[d]" them. In other words, it placed a lens between the Children and other people that caused them to see normal behavior as sexually motivated. Dr. Kenner was concerned by OH's November 2018 disclosure because it showed the Children were "growing up into this, and they have a distorted sense of reality." Based on his interactions with Mother, Dr. Kenner believed that Mother showed no signs of giving up on her campaign against Father. He referenced numerous text messages that Mother sent him after their 2019 interview, in which Mother tried to recruit him to be her advocate. In one message, Mother asked Dr. Kenner to "do something" about the Children, contact the judge on her behalf, and "write down everything that the judge had said to [Dr. Kenner]."

On the other hand, Mother presented the testimony of her psychiatrists, Dr. McMillan and Dr. Chang. Unlike Dr. Kenner, Dr. McMillan believed that the Mother's visitation needed to be restored. Dr. McMillan explained that Mother's behavior had improved over the past three years, and she was "beginning to see that she needs to refrain her behavior of speaking to the children about their father."

Dr. McMillan acknowledged that Mother has an "impulse control issue" and gets "blinded by . . . the fact that she doesn't have the children." But he stated that "when her children are not the issue, she's pretty good." Dr. McMillan admitted that treating Mother was challenging because "you can't make [her] believe something she doesn't believe." He also acknowledged contacting Dr. Chang in 2019 after Mother tried to communicate ex

parte with the court.[6] Dr. McMillan suggested they "reconsider her medication" given the possibility "that this was manic behavior." But Dr. McMillan ultimately adhered to a different explanation for Mother's conduct:

> [R]ather than look for a clinical diagnosis, there's an obvious one that doesn't require any pathology, and that is this is a mother who is so, so, so devoted to her children, and she believes that they are being sexually abused, and she can't get anybody to hear her or listen to her, or believes she can't get anybody to hear her or listen to her, or believe her or take her seriously. That just drives her nuts sometimes.

For these reasons, Dr. McMillan believed that Mother was not a danger to the Children. But he recommended OH continue therapy with Dr. Berryman, reasoning that OH was "caught between two parents" and needed someone he could trust "to talk about what's real."

The parties read into the record the evidentiary deposition of Dr. Chang. Dr. Chang had no concern about Mother's ability to parent the Children, but he admitted that he now realized he did not have "all the information" and what Mother had been telling him was "not fully accurate." Contrary to the Permanent Parenting Plan requirements, Mother never told Dr. Chang about her therapy with Dr. Monroe and never provided him with her past mental health records. He also acknowledged that if Mother "was getting too obsessive," she "could be a harm to the children."

During her testimony, Mother admitted to violating the Permanent Parenting Plan by not coordinating her treatment between Dr. Chang and Dr. Monroe and making derogatory comments about Father in front of the Children. Mother also admitted that she failed to pay child support and her share of extracurricular and therapy expenses. As for the Agreed Order of April 2017, Mother admitted to taking the Children to therapy with Dr. Berryman more often and longer than agreed to, and she admitted that she did not provide Father with quarterly updates on her mental health treatment. Mother also admitted to violating the restraining orders by not notifying Father before attending extracurricular events without a supervisor and going to Father's house without a supervisor present.

Mother denied discussing sexual abuse with the Children. Still, she admitted sending multiple emails to Dr. Berryman and Dr. McMillan about her "discussions with the Children about inappropriate touching by the father." When asked about the November 2018 recording, Mother insisted that "there were incidents leading up to [the audio recording]" that gave her cause for concern, but she could not recall what those events were. Mother stated that she "felt like [OH] was asking [her] for help," though Mother was

---

[6] The record suggests that Mother called the trial judge's office and left a message about scheduling a trial date three times.

"not sure of the words" that OH used. She described sitting down with OH and asking him to make the recording, and she admitted that she corrected OH's statements and made leading comments. But Mother denied instructing OH on what to say.

Mother testified that she still believed Father sexually abused the Children, but she understood that she could not discuss sexual abuse with the Children in the future.

## V. FINAL ORDER

After hearing the testimony and closing arguments, the trial court announced its findings from the bench. The trial court found that Mother violated several provisions in the Permanent Parenting Plan as well as later orders. Addressing Father's Petition for Civil Contempt, the court found that Mother had failed to pay her share of extracurricular and therapy expenses, for which it entered a monetary judgment; however, the court found her failures to remit such payments were not "willful" violations and, thus, not contemptuous.

Regarding Father's Petition to Modify Parenting Plan, the court found Mother's violations of the Parenting Plan and later court orders were "technical" in nature and "harmless." The trial court found that Mother "has impulse control issues" and "gets agitated because she cares so much for her Children." Still, the court credited Dr. McMillan's testimony about Mother's improvement. The court noted Dr. McMillan's opinion that Mother "has gotten better," "understands that she cannot say things that would alienate [Father] with the children," "is a loving and devoted parent," and "will now follow the rules." The court also agreed with Dr. McMillan's opinion that the Children need more counseling because they were "in a position where they can't please either one of the parents" and needed "to be able to talk to somebody they can trust."

The court also held that the November 2018 and January 2019 restraining orders were void because they violated Tenn. Code Ann. § 36-6-405(b) by temporarily modifying the residential schedule without a finding that unsupervised visitation would pose a substantial risk of harm to the Children and violated Tenn. Code Ann. § 36-6-112[7] by restricting Mother's visitation based solely on Mother's good faith allegations of abuse.[8]

---

[7] Tennessee Code Annotated § 36-6-112(b) provides:

> If a parent makes a good faith allegation based on a reasonable belief supported by facts that the child is the victim of child abuse, child neglect, or the effects of domestic violence, and if that parent acts lawfully and in good faith in response to that reasonable belief to protect the child or seek treatment for the child, then that parent shall not be deprived of custody, visitation, or contact with the child, or restricted in custody, visitation, or contact, based solely on that belief or the reasonable actions taken based on that belief.

[8] The November 2018 restraining order was entered by Judge Philip E. Smith, who recused himself in December 2018. The Order of January 25, 2019, was entered by Judge Phillip Robinson, who recused himself in August 2019.

- 12 -

The court reasoned that Mother's allegations were made in good faith based on the disclosure by OH.

Based on these and other findings, the court ordered Mother to keep seeing Dr. McMillan, and it ordered the parties to continue taking OH to see Dr. Berryman for therapy "for a period of time and for the frequency as advised by Dr. Berryman." As for Father's Petition to Modify Parenting Plan, the court found Father failed to prove a material change of circumstance existed. Accordingly, the court did not address whether the modification would be in the Children's best interests.

After the court announced its findings, Mother requested an award of attorney fees as the "prevailing party" under the MDA and Tenn. Code Ann. § 36-5-103(c).[9] The trial court denied the request, reasoning that Mother had not brought a "proceeding to enforce" the Permanent Parenting Plan or MDA.

This appeal followed.

## ISSUES

The parties raise a total of ten issues, which are combined or restated as follows:[10]

---

[9] Tennessee Code Annotated § 36-5-103(c) provides, in relevant part:

> A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the non-prevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

[10] Father raises four issues on appeal: (1) whether the trial court erred in not finding Mother's violations of court orders a material change of circumstances and the current Parenting Plan no longer in the best interest of the Children; (2) whether the trial court erred in, sua sponte, voiding the November 2018 and January 2019 orders; (3) whether the trial court erred in finding that Mother's continual referrals regarding sexual abuse were made in good faith; and (4) whether the trial court erred in not finding a substantial and material change in circumstances before modifying the Parenting Plan.

Mother raises six issues on appeal: (1) whether the trial court erred in its entry of the November 21, 2018 order restraining Mother from having any parenting time with the Children; (2) whether the trial court erred by restricting Mother's parenting time with the Children and failed to apply the applicable legal standard set forth in Tenn. Code Ann. § 36-6-405(b); (3) whether the trial court erred by finding that Father had not proved a material change in circumstances exists; (4) whether the trial court properly applied Tenn. Code Ann. § 36-6-112; (5) whether the trial court should be affirmed by ordering that Mother continue therapy with Dr. McMillan and that OH continue therapy with Dr. Berryman; (6) whether the trial court erred in finding that Mother must file a separate action in order to be awarded attorney fees pursuant to Tenn. Code Ann. § 36-5-103(c).

- 13 -

I.      Whether the trial court erred in finding that Father had not proved a material change in circumstance for purposes of modifying the parenting schedule to require supervised visitation.

II.     Whether the trial court erred in ordering Mother to continue therapy with Dr. McMillan and OH to continue therapy with Dr. Berryman.

III.    Whether the trial court erred in finding that Mother was not entitled to recover her attorney fees pursuant to Tenn. Code Ann. § 36-5-103(c) or the MDA.

## STANDARD OF REVIEW

"A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions." *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review a trial court's factual findings de novo, "accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *Boarman v. Jaynes*, 109 S.W.3d 286, 290 (Tenn. 2003). For the evidence to preponderate against a trial court's findings of fact, it must support another finding of fact with greater convincing effect. *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). We will also give great weight to a trial court's factual findings that rest on determinations of credibility. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *Woodward v. Woodward*, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). No presumption of correctness attaches to the trial court's conclusions of law, which we review "de novo without a presumption of correctness." *Blair v. Brownson*, 197 S.W.3d 681, 683 (Tenn. 2006).

We review a trial court's decisions related to the details of a parenting plan under an abuse of discretion standard. *Armbrister*, 414 S.W.3d at 693. This standard does not permit a reviewing court to substitute its discretion for that of the trial court. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). Nevertheless, the standard does not immunize a trial court's decision from any meaningful appellate scrutiny:

[R]eviewing courts should review a [trial] court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions. When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained

- 14 -

in Tenn. R. App. P. 13(d) and should review the [trial] court's legal determinations de novo without any presumption of correctness.

*Id*. at 524–25 (citations omitted).

**ANALYSIS**

### I. STANDARD TO PROVE A MATERIAL CHANGE OF CIRCUMSTANCE

The parties dispute the legal standard applicable to Father's Petition to Modify Parenting Plan. Father contends he was required to prove only a material change in circumstances under Tenn. Code Ann. § 36-6-101(a)(2). Because the only permanent relief Father sought was the indefinite suspension of her visitation, Mother contends that Father had to show that her visitation was "likely to endanger the child's physical or emotional health" under Tenn. Code Ann. § 36-6-301. After reviewing Tennessee's custody and visitation statutes and related caselaw, we find both Tenn. Code Ann. § 36-6-101(a)(2) and § 36-6-301 apply to Father's Petition.

As Father correctly points out, § 36-6-101(a)(2) requires parents seeking modification of a parenting plan to prove by a preponderance of the evidence that a "material change in circumstance" occurred since the entry of the last plan. *Id*. § 101(a)(2)(B) and (C). The material change in circumstance is a threshold requirement. *Armbrister*, 414 S.W.3d at 705. If the parent proves a material change in circumstance occurred, the court may modify the plan by following the same process used for crafting an initial plan. *See* Tenn. Code Ann. § 36-6-405(a) ("The process established by § 36-6-404(b) shall be used to establish an amended parenting plan . . . ."). This includes consideration of the best-interest factors in § 36-6-106. *Id*. § 36-6-404(b).

As Mother correctly points out, Tenn. Code Ann. § 36-6-301 separately requires courts to "grant such rights of visitation as will enable the child and the noncustodial parent to maintain a parent-child relationship **unless the court finds, after a hearing, that visitation is likely to endanger the child's physical or emotional health**." (Emphasis added). The statute continues, "[T]he court may require that visitation be supervised or prohibited until such abuse has ceased or until there is no reasonable likelihood that such abuse will recur." Tenn. Code Ann. § 36-6-301. We have recognized that § 36-6-301 expresses Tennessee's public policy "that the non-custodial parent be awarded visitation reasonably sufficient to maintain the parent-child relationship." *Melvin v. Melvin*, 415 S.W.3d 847, 851 (Tenn. Ct. App. 2011).

Thus, Tenn. Code Ann. §§ 36-6-101(a)(2) and -301 apply to different stages in the modification process. If a material change in circumstance is shown according to Tenn. Code Ann. § 36-6-101(a)(2), the specifics of the amended plan would be "within the broad discretion of the trial court," *Melvin*, 415 S.W.3d at 851 (citing *Smallwood v. Mann*,

205 S.W.3d 358, 361 (Tenn. 2006)), subject to the policy in § 36-6-301 and considering the best-interest factors in § 36-6-106.

Accordingly, we will consider the first issue raised by Father, whether the trial court erred in finding no material change in circumstance exists.

## II. MATERIAL CHANGE OF CIRCUMSTANCE

Father argues that "Mother's repeated accusations of sexual abuse and her failure to adhere to the Permanent Parenting Plan meet the requirements of a material change." Conversely, Mother contends that the trial court correctly found her violations of the Parenting Plan were not "material" because they were "technical" and "harmless."

Before addressing the merits of Father's argument, we find it necessary to address a discrepancy overlooked by both parties. In its ruling from the bench, the trial court stated that it was applying the "material change in circumstance" standard from Tenn. Code Ann. § 36-6-101(a)(2)(**B**); in its final order, the trial court cited the "material change in circumstance" standard from Tenn. Code Ann. § 36-6-101(a)(2)(**C**). On appeal, Father cites the former, and Mother cites the latter.

As originally written, Tenn. Code Ann. § 36-6-101(a)(2) provided a single "material change of circumstance" standard for proceedings in which "the issue before the court [was] a modification of the court's prior decree pertaining to custody **or** a residential parenting arrangement." Tenn. Code Ann. § 36-6-101(a)(2)(B) (Supp. 2002) (emphasis added). An amendment in 2004 removed the words "or a residential parenting arrangement" and "added an entirely new subsection pertaining exclusively to modification of a residential parenting schedule." *Armbrister*, 414 S.W.3d at 702. Thus, the current version of § 36-6-101(a)(2) contains two "material change" standards:

> (B)(i) If the issue before the court is a modification of the court's prior decree **pertaining to custody**, the petitioner must prove by a preponderance of the evidence a material change in circumstance. . . . A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.
>
> .  .  .
>
> (C) If the issue before the court is a modification of the court's prior decree **pertaining to a residential parenting schedule**, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interests. . . . A material change of circumstance for purposes of modification of a

- 16 -

residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

(Emphasis added). The language change was intended "'to make it easier to establish that a material change in circumstances has occurred' when a party seeks to modify a residential parenting schedule." *Armbrister*, 414 S.W.3d at 703 (quoting *Boyer v. Heimermann*, 238 S.W.3d 249, 259 (Tenn. Ct. App. 2007)).

At the final hearing, Father stated that he was seeking an order for Mother's visitation to be supervised. Although Father did not request a specific change to the residential parenting schedule, the supervision of Mother's visitation would entail some adjustment. For that reason, we will apply Tenn. Code Ann. § 36-6-101(a)(2)(C), the statute cited by the trial court in its final order and relied on by Mother on appeal.

As noted earlier, "[a] trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions." *Armbrister*, 414 S.W.3d at 692. Thus, we "must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings." *Id.* at 693; *see* Tenn. R. App. P. 13(d).

As explained, § 36-6-101(a)(2)(C) gives several examples of what may constitute a "material change in circumstance":

A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; **failure to adhere to the parenting plan**; or other circumstances making a change in the residential parenting time in the best interest of the child.

(Emphasis added). The Tennessee Supreme Court has recognized that § 36-6-101(a)(2)(C) sets "a very low threshold for establishing a material change of circumstances." *Armbrister*, 414 S.W.3d at 703 (quoting *Boyer*, 238 S.W.3d at 257). Further, "[t]hough temporary custody orders may be entered after the entry of the final decree, a change in circumstances is measured from the final order of custody under which the parties are currently operating." *Keisling v. Keisling*, 196 S.W.3d 703, 719 (Tenn. Ct. App. 2005). And, while the change must have occurred after the entry of the final order, the doctrine of res judicata does not bar a parent from putting on proof about the other parent's "history of bad behavior

- 17 -

just because that behavior took place before the entry of the last parenting plan." *Bowen v. Wiseman*, No. M2017-00411-COA-R3-CV, 2018 WL 6992401, at *10 (Tenn. Ct. App. June 29, 2018).

Mother admitted that she violated the Permanent Parenting Plan by not coordinating the continuation of her treatment between Dr. Monroe and Dr. Chang. The trial court found this and other violations were not "material." We, however, respectfully disagree with this characterization, which misconstrues the context in which the Parenting Plan was entered. Less than two months before the Parenting Plan was executed, Mother's visitation was restored based on evidence she was motivated and progressing in her treatment for "intrusive thoughts" about Father abusing the Children. Thus, the Parenting Plan required Mother to continue the same course of therapy she represented as helping her, and it gave Father the ability to confirm her compliance with the treatment plan for the duration of the Children's minority or until she was released from treatment. After Mother's visitation was suspended in 2016, she succeeded in having it restored again based on evidence that she was receiving treatment from Dr. McMillan.

The evidence at the January 2020 trial reveals, however, that Mother not only failed to fulfill her obligations under the Parenting Plan, but she also either misrepresented or abandoned her desire to change. Mother's refusal to accept the findings of multiple DCS investigations and other professional evaluations caused the Children to undergo more therapy, interviews, and examinations.

This court has consistently found that continuing accusations of abuse by one parent against the other constitutes a material change of circumstance for modifying a permanent parenting plan. *See Keisling*, 196 S.W.3d at 721–22 (finding mother's "persistent unfounded accusations of child abuse constitute[d] a material change in circumstances that . . . affect[ed] the well-being of the children in a meaningful way."); *In re Avery B.*, No. W2016-02542-COA-R3-JV, 2018 WL 2671593, at *8 (Tenn. Ct. App. June 4, 2018) (affirming that father proved a material change when mother's unfounded accusations prompted numerous "examinations, evaluations, and investigations"); *In re Jonathan S. C-B*, No. M2010-02536-COA-R3-JV, 2012 WL 3112897, at *18–19 (Tenn. Ct. App. July 31, 2012) (affirming finding of a material change when mother refused to consider evidence that abuse did not occur and her "obsession" led to unnecessary investigations); *Agee v. Agee*, No. W2007-00314-COA-R3-CV, 2008 WL 2065996, at *8 (Tenn. Ct. App. May 16, 2008) (affirming finding of a material change in circumstances based on the "[m]other's subjecting [the child] to numerous exams" to investigate unfounded allegations of sexual abuse); *In re A.N.F.*, No. W2007-02122-COA-R3-PT, 2008 WL 4334712, at *20 (Tenn. Ct. App. Sept. 24, 2008) (affirming finding that mother's multiple, unfounded allegations of sexual abuse constituted a material change).

As we have explained, allegations of sexual abuse by one parent against the other can have grave consequences:

Accusations of child sexual abuse by one parent against the other parent presents one of the most difficult issues faced by a trial court. Suspicion of such abuse must be taken seriously and . . . investigated thoroughly, for the consequences to the child of allowing any abuse to continue are grave. However, mistakenly concluding that a parent has abused his child, when in fact there has been no abuse, has serious consequences as well, including the almost-certain destruction of the parent-child relationship and disgrace to the accused parent. In addition, determining whether abuse has occurred can be enormously difficult; there is frequently a paucity of physical evidence, and the alleged child victim may be unable to accurately relate pertinent events. Finally, even investigating the accusation is delicate; the suggestibility of the alleged victim is almost invariably an issue, and heavy-handed or repetitive interrogation or physical examination can itself inflict long-lasting trauma on a child.

.      .      .

[A]ny concern about reporting allegations of child sexual abuse must be balanced with the awareness that false accusations of such abuse can be a "reprehensible tool" against an ex-spouse, remarkable for its "brutal effectiveness."

*Keisling*, 196 S.W.3d at 722.

For these reasons, we find many of Mother's violations of the Parenting Plan were material. This finding, however, does not predetermine whether a material change of circumstance existed **as of the time of trial**. *See In re Kaitlyn M.W.*, No. W2010-00301-COA-R3-CV, 2010 WL 5541054, at *7 (Tenn. Ct. App. Dec. 28, 2010) (affirming trial court's finding that alleged changes in circumstance, "though serious, were largely resolved by the time of trial" based on trial court's acceptance of mother's "testimony that the situation had been remedied"). Thus, we must consider whether the evidence preponderates against the trial court's findings that—as of the time of trial—Mother had "gotten better overall," was "making a lot of progress," "understands that she cannot say things that would alienate [Father from] the children," and "will now follow the rules."

Father filed his Petition to Modify Parenting Plan in November 2018 and obtained a temporary restriction of Mother's visitation in January 2019. Because of procedural delays, the final hearing was not held until January 2020, fourteen months after Father filed his Petition. To be clear, the evidence established that a material change in circumstance existed in November of 2018 and remained for a period of time thereafter. Getting Mother's attention and compliance with the Parenting Plan required the trial court to take stern action, including suspending and restricting Mother's parenting time. Nevertheless, and significantly, the trial court found the evidence no longer showed "a reasonable need" for the supervision as of January 2020. *See Culbertson v. Culbertson*, 455 S.W.3d 107, 157

(Tenn. Ct. App. 2014) ("[S]upervision [of parenting time] is normally intended to continue only so long as there is a reasonable need for it." (quoting *B.M.M. v. P.R.M.*, No. M2002-02242-COA-R3-CV, 2004 WL 1853418, at *18 (Tenn. Ct. App. Aug. 18, 2004))). Stated another way, the court concluded that a material change in circumstance no longer existed as of January 2020.

As noted earlier, "[a] trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions." *Armbrister*, 414 S.W.3d at 692. Thus, we "must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings." *Id.* at 693; *see* Tenn. R. App. P. 13(d). Moreover, it is readily apparent that the trial court found Mother's new sense of awareness credible, and we give great deference to such determinations. *See Estate of Walton*, 950 S.W.2d at 959 (stating that appellate courts give "great weight to the trial court's determinations of credibility"); *B.M.M.*, 2004 WL 1853418, at *18 (recognizing that, because "supervision stems from the delicate balancing of protection of the child with preservation of the child's relationship with her parent, . . . such decisions hinge on the trial court's assessment of the parties' credibility, specifically, whether the parent can be trusted to spend time alone with the child without violating the necessary boundaries"); *see also In re Kaitlyn M.W.*, 2010 WL 5541054, at *7 (deferring to trial court's accreditation of mother's testimony that the alleged change in circumstance "had been remedied" by the time of trial).

Having conducted a close examination of the relevant and material facts, we conclude that the evidence does not preponderate against the trial court's finding that the evidence failed to meet the material change in circumstance standard in Tenn. Code Ann. § 36-6-101(a)(2)(C).[11] Accordingly, we affirm the trial court's decision to deny Father's Petition to Modify Parenting Plan and reinstate Mother's unsupervised visitation.[12]

---

[11] A trial court may proceed to consider the children's best interests only if a material change in circumstances is established. *See Boyer*, 238 S.W.3d at 259. Therefore, our affirmance of the trial court on this issue pretermits a best-interest inquiry. We have also determined that two of Mother's issues are pretermitted as moot. These issues are "(1) [w]hether the trial court erred in its entry of the November 21, 2018 order restraining Mother from having any parenting time with the Children;" and "(2) [w]hether the trial court erred by restricting Mother's parenting time with the Children and failed to apply the applicable legal standard set forth in Tenn. Code Ann. § 36-6-405(b)." Neither order is currently in effect; therefore, there is no meaningful relief we could grant her at this time if we agreed with her contentions. As a consequence, the issues are moot. *See Jacks v. City of Millington Bd. of Zoning Appeals*, 298 S.W.3d 163, 175 (Tenn. Ct. App. 2009) ("[A] case will generally be considered moot when the prevailing party will be provided no meaningful relief from a judgment in its favor." (quoting *Cty. of Shelby v. McWherter*, 936 S.W.2d 923, 931 (Tenn. Ct. App. 1996))). Accordingly, we have not addressed these issues.

[12] Father also challenged the trial court's finding that the November 2018 and January 2019 orders were void under Tenn. Code Ann. §§ 36-6-405(b) and -112, contending it did not have the authority to set aside or void an order entered by another judge. We find this contention wholly without merit because the

- 20 -

## III. ORDER TO CONTINUE THERAPY

Father also contends that the trial court erred by "modifying" the Permanent Parenting Plan to require Mother to continue counseling with Dr. McMillan and to require OH to continue counseling with Dr. Berryman without engaging in a best-interest analysis. Mother contends the order for her to continue therapy with Dr. McMillan was not a modification of the Parenting Plan because the Plan requires her to continue therapy but does not identify a specific healthcare provider. As for OH, Mother contends the parties agreed OH would continue treatment with Dr. Berryman in the Agreed Order of April 2017.

While we agree that the court did not err in ordering Mother to continue therapy "with Dr. McMillan,"[13] we find the issue of whether OH would continue therapy with Dr. Berryman was not properly before the court. The Parenting Plan required that OH continue seeing his therapist at the time, Ms. Brown, and it provided a process for selecting a replacement if Ms. Brown discontinued her services:

> [OH] shall continue his therapy with Paris Brown . . . with such frequency and duration of therapy as determined in collaboration with Ms. Brown. . . .
>
> If Paris Brown should become unavailable to continue or discontinues her treatment as therapist for [OH], she shall recommend her replacement if she determines that continued therapy is necessary[,] and the new therapist has to be agreed upon by the parents . . . . In the event the parties are unable to agree on a new therapist, the Father shall have the ultimate decision[-]making authority for the same . . . . Should the Mother object to the Father's choice of a therapist, she may file a Petition with the court for a determination of the same.

Ms. Brown discontinued her treatment of OH in or around May 2016. According to the allegations in Father's first Petition to Modify Parenting Plan, Ms. Brown told Father that "she would not recommend going to another therapist as Respondent/Mother would most likely use that as an opportunity to exploit her agenda to make additional allegations." Regardless, the parties agreed in April 2017 to send OH to therapy for a defined period of

---

two judges at issue were presiding over the very same case that was before the trial court. Moreover, we find this issue is pretermitted as moot because the trial court reinstated Mother's unsupervised visitation at set forth in the Permanent Parenting Plan, which reinstatement, by necessity, required rescinding both restraining orders at issue.

[13] Mother does not object to continuing therapy with Dr. McMillan, and Father has not shown the alleged error resulted in prejudice to him. See Tenn. Ct. App. R. 6(a)(3). Thus, we find no reversible error in this regard.

18 months—or 36 sessions.[14] The required sessions have been satisfied, and the 18-month time period has expired. Thus, we find the parties completed their obligations under the Parenting Plan and the Agreed Order of April 2017.

Furthermore, the Parenting Plan mandates that any request for additional therapy would be subject to the allocation of decision-making authority between the parties. The Parenting Plan states that, "[i]f a dispute or disagreement arises [regarding major decision making], Father's decision shall control until or unless the disputed issue is properly brought before the court and adjudicated by the court." The only pleadings before the court in January 2020 were Father's Petition to Modify Parenting Plan and Petition for Civil Contempt, neither of which requested additional therapy for OH. The first mention of additional therapy came from Mother when she testified that she believed the Children needed a therapist and was "open to counsel suggesting a therapist or the judge suggesting a therapist." Thus, we find the matter was not "properly brought before the court and adjudicated by the court."

For the above reasons, we vacate the trial court's order for OH to continue therapy with Dr. Berryman.[15]

## IV. ATTORNEYS' FEES

Finally, Mother contends that the trial court erred by denying her request for attorneys' fees under Tenn. Code Ann. § 36-5-103(c) and the MDA. Father contends the trial court did not abuse its discretion to deny an award under the statute because she was not the prevailing party, and he asserts that the MDA did not apply to his Petition to Modify Parenting Plan and Petition for Contempt.

Tennessee Code Annotated § 36-5-103(c) allows an award of attorney's fees to the "prevailing party" in parenting plan enforcement proceedings:

> A prevailing party may recover reasonable attorney's fees . . . from the non-prevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action

---

[14] Although the April 2017 Agreed Order required both OH and LH to attend therapy, the trial court omitted LH from its order for additional therapy because the Permanent Parenting Plan contemplated therapy for only OH.

[15] The trial court was justifiably motivated by Dr. McMillan's testimony that, in his opinion, the Children needed to have someone to talk with. He recommended Dr. Berryman because they were already familiar with her. Thus, it may be advisable for the parents to follow Dr. McMillan's recommendation and agree for more therapy to ensure OH remains, as the Parenting Plan provides, "psychologically healthy, in spite of the parents' history of a contentious relationship with each other."

concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

Similarly, § 20 of the MDA provided for an award of attorneys' fees to the "successful party" in enforcement actions:

> **20. ENFORCEMENT.** In the event that it becomes reasonably necessary for either party to institute or defend legal proceedings relating to the enforcement of any provision of this Agreement, the successful party shall be entitled to a judgment for reasonable expenses, including attorney's fees, incurred in connection with such proceedings.

Typically, "[f]ee requests made pursuant to contractual and statutory authority must be analyzed separately." *Eberbach v. Eberbach*, 535 S.W.3d 467, 477 (Tenn. 2017). Here, however, we find Mother was not entitled to an award of fees under contract or statute because she was not the "prevailing" or "successful" party.

Mother argues that she was the "prevailing party" because she "successfully and completely defended an action to restrict or terminate her parenting time" and that "[h]er full parenting time was restored without restriction or modification." In his Petition to Modify Parenting Plan and Motion for Civil Contempt, Father sought: (1) a temporary restriction of Mother's visitation; (2) an "indefinite" restriction of Mother's visitation; (3) a restraining order prohibiting Mother from discussing the sexual abuse allegations; (4) reimbursement for Mother's share of extracurricular and unpaid medical expenses; and (5) an award for past-due child support. Contrary to Mother's assertion, Father did not seek to "terminate her parenting time."

In reaching our determination, we find persuasive the Tennessee Supreme Court's decision in *Fannon v. City of LaFollette*, 329 S.W.3d 418 (Tenn. 2010). In *Fannon*, the plaintiff filed a declaratory-judgment action that asserted the city council passed a resolution in violation of the Tennessee Open Meetings Act. *Id*. at 420. The trial court granted a temporary restraining order that restricted implementation of the resolution until the city complied with specific procedural requirements. *Id*. After the city complied with the procedural process, the trial court dismissed the action as moot. *Id*.

Even though the temporary restraining order did not address the merits of the plaintiff's Open Meetings Act argument, our Supreme Court held that the plaintiff was the "prevailing party." *Id*. The Court explained that "[w]hile the issuance of the temporary restraining order maintained the status quo, . . . the Plaintiff obtained some relief inasmuch as the effect of the resolution was suspended until and unless the City Council complied with the terms of the Charter." *Id*. at 432. Thus, "[t]he litigation altered the 'legal relationship' between the parties and served to modify the 'behavior' of the Defendants."

*Id.* The Court stated that "a party need not attain complete success on the merits of a lawsuit in order to prevail." *Id.* at 431.

As for Father's Petition for Civil Contempt, Mother admitted to violating various provisions in the Parenting Plan, including not paying child support and her share of other expenses. Although she paid the child support arrearage before the final hearing and the court found Mother's failure to pay was not contemptuous, the court nonetheless awarded Father a judgment for the extracurricular fees and medical expenses. Thus, Father successfully obtained the relief that he sought.

As for Father's Petition to Modify Parenting Plan, the trial court granted Father's request for a temporary restraint of Mother's parenting time in January 2019. A year later, the court found Mother had "gotten better overall," was "making a lot of progress," "understands that she cannot say things that would alienate [Father from] the children," and "will now follow the rules." Thus, Father successfully altered the "legal relationship" between the parties and "modified" Mother's behavior by suspending and restricting her visitation for a year.

For these reasons, we affirm the trial court's decision to deny Mother's request for attorney's fees under the Tenn. Code Ann. § 36-5-103(c) and the MDA.

## IN CONCLUSION

The judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded with costs of appeal assessed against Gregory Charles Hoppe.

_____
FRANK G. CLEMENT JR., P.J., M.S.